In re Jonathan Michael YOUNG, Debtor.

Jonathan Young, Plaintiff

v.

Kristalynn Young, Defendant.

Bankruptcy No. 6:08–bk–70230.
Adversary No. 6:10–ap–07215.

United States Bankruptcy Court,
W.D. Arkansas,
Hot Springs Division.

Sept. 11, 2013.

924

Annabelle Lee Patterson, Annabelle Lee Patterson, PLC, Hot Springs, AR, for Plaintiff.

Marc Honey, Honey Law Firm, P.A., Hot Springs, AR, for Defendant.

### *ORDER IMPOSING SANCTIONS*

RICHARD D. TAYLOR, Bankruptcy Judge.

On December 30, 2010, Jonathan Young, the debtor ("debtor"), commenced an adversary proceeding to determine whether Kristalynn Young, now Stephens ("Stephens"), his ex-wife, violated the automatic stay. The trial ("AP Trial") concluded on April 22, 2013. The court issued its *Memorandum Opinion* on June 10, 2013. As a result of its review of the pleadings, exhibits, and testimony, the court also issued an *Order to Appear and Show Cause* ("OSC")

on the same date. The OSC directed the debtor to demonstrate why his bankruptcy case should not be dismissed pursuant to 11 U.S.C. § 1307(c)(11) and directed his attorney, Kathy A. Cruz ("Cruz"), to show cause why she should not be sanctioned pursuant to Federal Rule of Bankruptcy Procedure 9011.

The court heard the OSC on July 24, 2013 ("OSC Hearing"). Cruz appeared personally and by her counsel, Jeffrey M. Rosenzweig; the debtor appeared pro se as Cruz had withdrawn as his attorney. Following the OSC hearing, the court took the OSC under advisement.

The OSC is hereby withdrawn as to the debtor; the debtor's case is not dismissed and may proceed. Cruz, however, violated Rule 9011 and sanctions are appropriate. This conclusion is compelled by the findings and conclusions set forth in the Memorandum Opinion, the record in this case, the record in the adversary proceeding, and as set forth herein. Further, Cruz made misrepresentations to this court during her testimony at the OSC Hearing. Accordingly, sanctions are also appropriate pursuant to 11 U.S.C. § 105 and this court's inherent powers.

For her violations of Rule 9011, Cruz is hereby suspended from practicing directly or indirectly in the United States Bankruptcy Courts for the Eastern and Western Districts of Arkansas for a period of six months commencing September 23, 2013, and ending March 23, 2014. She is also reprimanded and fined $1000 payable on or before September 27, 2013, to Jean Rolfs, Clerk of the United States Bankruptcy Court. Prior to March 23, 2014, Cruz must also provide this court with proof that she has attended twelve hours of continuing legal education in the area of Chapter 13 Bankruptcy.

For her misrepresentations to this court during the OSC Hearing, Cruz is hereby concurrently suspended from practicing directly or indirectly in the United States Bankruptcy Courts for the Eastern and Western Districts of Arkansas for a period of six months commencing September 23, 2013, and ending March 23, 2014. She is also reprimanded and fined an additional $1000 payable on or before September 27, 2013, to Jean Rolfs, Clerk of the United States Bankruptcy Court. Further, the court will refer and provide a copy of this *Order Imposing Sanctions* to the Office of the Committee on Professional Conduct.

## I. Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 as well as 11 U.S.C. § 105. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (C), and (O). The following order constitutes findings of fact and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 7052 and 9014.

## II. Background

The expositive findings of fact and conclusions of law set forth in the Memorandum Opinion are incorporated by reference herein and need not be repeated. The analysis below includes references to the Memorandum Opinion, the full record of the debtor's bankruptcy case, the adversary proceeding record, the AP Trial, and the OSC Hearing. Crucial, however, to an understanding of this order is the recognition that Stephens, pro se and through her original counsel, and the debtor, pro se and through Cruz, all acted without deference to the United States Bankruptcy Code's ("Code") treatment of domestic support obligations. Cruz's pervasive role as debtor's counsel stood out and invited additional scrutiny.

In summary, the debtor and Stephens finalized their divorce on November 1, 2007. The *Decree of Divorce* ("Divorce Decree") ordered the debtor to pay Stephens alimony of $1100 a month for one year (subject to adjustment thereafter at the request of either party), attorney's fees of $10,890, and restitution of $2350. (Debtor Ex. 41 at 2.) He promptly failed to pay alimony, and, in January 2008, he was briefly jailed. His parents secured his release by posting a $5000 bond. Immediately after his initial incarceration, the debtor, on January 24, 2008, filed for protection under Chapter 7 of the Code.

The debtor appealed the Divorce Decree, and his appeal was pending when he filed bankruptcy. Before responding to the appeal, Stephens filed a *Motion for Relief from Stay* ("Stay Motion"). By agreement of the parties, the bankruptcy court entered an order ("Stay Order") granting the Stay Motion on June 25, 2008. The Stay Order, drafted and approved by the parties, contained language that led Stephens to believe she could pursue the debtor for contempt. This resulted in the debtor's second incarceration and generated the filing of the adversary proceeding alleging a stay violation.[1]

Before the Circuit Court contempt hearings, the debtor, on July 1, 2008, converted his case to a Chapter 13. Cruz filed the debtor's initial Chapter 13 plan on July 17, 2008.[2] The plan failed to provide for Stephens despite the fact that the debtor's Schedule E referenced prepetition attorney's fees of $10,890 and restitution of

---

1. The contempt hearings occurred in the Circuit Court of Garland County, Arkansas, in December 2008 and March 2009.

2. Michael E. Sanders initially represented the debtor in his Chapter 7; Cruz approved the Stay Order and took over for the Chapter 13 phase.

$2350.[3] (Ch. 7 Vol. Pet. 22, Jan. 24, 2008, ECF No. 1.) The debtor's Schedule J referenced alimony as an $1100 monthly expense. (Pet. 28, ECF No. 1.) On August 21, 2008, Stephens objected to the plan on the grounds that it failed to address alimony, attorney's fees, and restitution. She also objected to the listing of alimony as a monthly expense on the debtor's Schedule J given that he had not made any alimony payments.

On September 3, 2008, the Arkansas Court of Appeals affirmed the Divorce Decree. (Debtor Ex. 43.) Relying on the appellate court's ruling and the Stay Order, Stephens sent a letter to the debtor on October 6, 2008 ("October 6 Letter"), that outlined the debtor's arrearages and advised him that, absent assurances that she would receive payment by the end of the month, she would file contempt charges against him. According to Stephens, the debtor owed $14,300 in accrued alimony, which represented thirteen missed payments from October 2007 through October 2008. Applying the $5000 bond posted by the debtor's parents to the $14,300 in arrearages resulted in an alimony balance of $9300. Most, if not all, of this alimony accrued postpetition.[4]

Upon receipt of the October 6 Letter, the debtor conferred with Cruz. Cruz did not react by interposing the automatic stay. Instead, on October 8, 2008, she amended the debtor's Schedule E to include the entire $9300 in accrued alimony as an unsecured priority claim under section 507(a)(1), a section reserved for prepetition domestic support obligations. Cruz also filed a *Modification of Chapter 13 Plan* ("Modified Plan"). The Modified Plan characterized the $9300 in alimony as

"past due" priority debt. The Modified Plan further stated that the debtor would "continue" to make his $1100 monthly alimony payments to Stephens directly. The debtor had not, and did not thereafter, "continue" making those payments, however.

Stephens found the debtor's October 8 response to her October 6 Letter unsatisfactory. As a result, she took two steps. First, she filed an objection to the Modified Plan on October 31, 2008. Stephens's attorney ultimately withdrew this objection at a hearing held on January 21, 2009. Second, Stephens filed a *Petition for Order to Show Cause, for Renewed Alimony, for Contempt, Attorney's Fees and Other Relief* ("Petition") on November 12, 2008, in Circuit Court. The Petition recited that the debtor failed to "pay said alimony and currently is in arrears the total sum of $9,300.00." (Debtor Ex. 45 at 2, ¶ 4.)

The Circuit Court held a hearing on the Petition on December 11, 2008. Michael Crawford represented Stephens. The debtor appeared pro se. At the conclusion of the hearing, the Honorable Marcia R. Hearnsberger ("Judge Hearnsberger") found the debtor in contempt for failure to pay past due alimony and attorney's fees. Judge Hearnsberger, however, held the contempt order in abeyance for sixty days to give the debtor an opportunity to ascertain the impact of the automatic stay on the contempt proceedings. She entered her formal *Order of Support and Contempt* ("Contempt Order") on December 16, 2008, which advised the debtor that if he failed to "secure a stay" from the bankruptcy court, he had to post a bond for past due alimony of $8200[5] plus attorney's

---

**3.** The debtor's original Schedule E made no reference to alimony.

**4.** The debtor filed his Chapter 7 petition on January 24, 2008.

**5.** At the December 11, 2008 contempt hear-

fees by March 1, 2009, or surrender to the Garland County Sheriff's Department.

The debtor conferred with Cruz after the December 11 hearing. She advised him that the stay still applied but took no further steps to protect him. The debtor failed to post a bond or surrender to the Garland County Sheriff's Department. As a result, Judge Hearnsberger convened a second hearing on March 9, 2009. The debtor again appeared pro se.

During the March 9 hearing, the debtor argued that he was making his $465 a month disposable income payments to the bankruptcy trustee and that Stephens would receive those funds once she filed a proof of claim. At the conclusion of the hearing, Judge Hearnsberger immediately jailed the debtor for his failure to pay past due alimony and attorney's fees. His incarceration lasted thirty days. The debtor, before and after jail, never made his alimony payments to Stephens despite their inclusion on his Schedule J as a monthly expense. The debtor did consistently make his $465 a month disposable income payment to the Chapter 13 Standing Trustee ("Trustee"). However, this figure was calculated *after* deducting his $1100 monthly alimony expense.

Although Stephens withdrew her plan objection in January of 2009, confirmation of the debtor's plan did not immediately result. The Trustee also had pending objections. The Trustee initially filed an objection on August 21, 2008, based, inter alia, on the following:

11 U.S.C. 1325(a)(8) Debtor has failed to provide proof that the debtor has paid all amounts required to be paid under a domestic support obligation that first [became] payable after the date of the filing of the petition.

(Obj. to Conf. of Plan, Aug. 21, 2008, ECF No. 48.)

Over two years elapsed from January 21, 2009, the date Stephens withdrew her objection to confirmation, until confirmation on April 6, 2011. During that two year period, the debtor filed two more modifications to his plan. On March 5, 2009, the debtor filed his second modification ("Second Modified Plan") that inexplicably did not modify anything; it simply reiterated the $465 a month disposable income calculation. (Mod. of Ch. 13 Plan, Mar. 5, 2009, ECF No. 109.) On the same date, the debtor filed an amended Schedule J that reflected, as per Judge Hearnsberger's order, an amended alimony expense of $800. After the debtor filed the Second Modified Plan, the Trustee renewed his previous objection on the ground that the debtor still had not certified to the Trustee that he had paid his postpetition domestic support obligations. The Trustee filed his last renewed objection on that basis on March 19, 2009. (Debtor Ex. 26.) Yet, this simple certification was not immediately forthcoming.[6] Instead, the debtor secured seventeen continuances of the confirmation hearing for over two years while the Trustee's objection remained outstanding.

Finally, on March 22, 2011, Cruz filed a third modification ("Third Modified Plan"), which stated that the debtor "believe[d] he [was] current on all domestic support obligations that were due after the filing date

---

ing, Stephens's attorney used a twelve month arrearage figure, or $13,200, minus the $5000 bond, for a balance of $8200. (Debtor Ex. 46 at 80.) Stephens, in her October 6 Letter, used a thirteen month period, or $14,300 minus $5000, for a $9300 balance.

**6.** At the OSC Hearing, Cruz suggested one reason for the delay was the debtor's pending objection to Stephens's proof of claim. However, the debtor's objection to Stephens's claim was resolved by July 29, 2009.

of his chapter 13 plan." (Mod. of Ch. 13 Plan, Mar. 22, 2011, ECF No. 210.) This statement is the only substantive term of the Third Modified Plan. This certification apparently rendered the Trustee's objection moot, and the court subsequently entered an *Order Confirming Chapter 13* on April 6, 2011. Following confirmation, the Trustee distributed a lump sum to Stephens and continued making monthly payments to her thereafter. Those payments substantially depleted the debtor's $465 monthly plan payment.

During the delay pending confirmation, Cruz filed a *Complaint* on December 30, 2010, and an *Amended Complaint* ("Complaint") on January 5, 2011, on the debtor's behalf against Stephens for an alleged violation of the automatic stay. The Complaint referred to the debtor's alimony arrearages as *prepetition* alimony. The Complaint also asserted that Stephens had not been paid because she failed to file a proof of claim and continued to object to confirmation. The Complaint resulted in the AP Trial, the Memorandum Opinion, and the OSC.

### III. Federal Rule of Bankruptcy Procedure 9011

■ Rule 9011(c) permits a court to impose sanctions by motion or on its own initiative for violations of Rule 9011(b). Once an attorney files a pleading or paper with the court, he or she certifies:

to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous

argument for extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

FED. R. BANKR.P. 9011(b) (2013). *See also Crofford v. Conseco Fin. Serv. Corp. (In re Crofford* ), 301 B.R. 880, 884 (8th Cir. BAP 2003). Thus, filing a pleading that is not well grounded in fact, warranted by existing law, or based on a good faith argument for a change of existing law can result in the imposition of sanctions pursuant to Rule 9011.

■ An attorney is "judged by the standard of [a] reasonable party or lawyer. . . ." *Cox v. Swiss–Am., Inc. (In re Affiliated Foods SW., Inc.)*, 472 B.R. 538, 547 (Bankr.E.D.Ark.2012) (citations omitted). Thus, when considering whether to impose sanctions, the court must determine "whether 'a reasonable and competent attorney would believe in the merits' of the filing." *In re Robinson*, 373 B.R. 612, 625 (Bankr.E.D.Ark.2007) (quoting *Crofford*, 301 B.R. at 885 (citing *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir.2003))). *See also In re Rivera*, 342 B.R. 435, 460 (Bankr.D.N.J.2006) (noting that "[t]he 'pure-heart-and-empty-head' defense is not available to anyone faced with Rule 9011 sanctions.") The court must also determine whether the signing attorney conducted a reasonable inquiry to ensure that the filing is factually and legally sound. *See Briggs v. LaBarge (In re Phillips* ), 317 B.R. 518, 522 (8th Cir. BAP 2004). This duty of reasonable inquiry imposed by Rule 9011 requires attorneys "to stop, think, and investigate more carefully before" filing papers with the court. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384,

398, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

■ The Memorandum Opinion, the full record of the debtor's bankruptcy case, the adversary proceeding record, and the transcripts from the AP Trial as well as the OSC Hearing collectively reflect a violation of Rule 9011. Cruz filed pleadings that were not grounded in fact or law. She offered no credible argument for an extension of the law to support her assertions or contentions contained in the pleadings and at the OSC Hearing. As discussed in more detail below, the court finds that Cruz's conduct throughout this case warrants sanctions pursuant to Rule 9011.

### IV. OSC Hearing

The OSC, initiated by the court, specifically identified four areas of concern relative to possible Rule 9011 violations by Cruz. The OSC explicitly listed legal and factual concerns raised by the Modified Plan, the amended Schedule E, the Complaint, and the Third Modified Plan. During the OSC Hearing, Cruz offered explanations for her actions. Each issue is examined below.

#### 1. The Modified Plan: $9300 in Alimony Characterized as Past Due Prepetition

A. The OSC asked Cruz to address the following:

As a result of a demand letter from his ex-wife, the debtor modified his plan relative to pre-and postpetition past-due domestic support obligations. The October 8, 2008 *Modification of Chapter 13 Plan* ("Modified Plan"), drafted by Cruz, addressed $9300 in alimony, $10,890 in attorney's fees, and $2350 in restitution as debts to be paid in full during the life of the plan. (Debtor's Ex. 12 at 1.) The $9300 in postpetition accrued alimony is characterized as "past due alimony." (Debtor's Ex. 12 at 1.) The alimony,

however, was not "past due" prepetition; the alimony was past due postpetition. Cruz blended these two concepts. This conflation continues in the Complaint she signed and filed in this adversary proceeding. The Complaint alleges: "[the debtor] was to have been incarcerated for 30 days or pay a bond of $8,200 for alimony arrearages that were included in the chapter 13 plan as *pre-petition* alimony." (Compl. 6, Jan. 5, 2011, AP ECF No. 3.) (emphasis added). Both the Modified Plan and the Complaint inaccurately characterized postpetition accrued alimony as prepetition. Further, the Modified Plan stated that the debtor would "continue to pay his current monthly alimony of $1,100.00 to [his ex-wife] direct." (Debtor's Ex. 12 at 1.) The term "continue" is misleading as the debtor had not been and did not "continue" making his postpetition alimony payments.

#### B. Analysis

The Modified Plan—Cruz's immediate reaction to the October 6 Letter—must be analyzed in the context of the Code's treatment of domestic support obligations. Further, Cruz's explanation at the OSC Hearing contradicted her own characterization of the $9300 as alimony in the Modified Plan and Complaint.

##### i. Domestic Support Obligations Under the Code

The Modified Plan, coupled with the amended Schedule E that mischaracterized postpetition alimony as prepetition priority debt, did not conform to the Code. Additionally, at the OSC Hearing, Cruz introduced an alternative theory that she was entitled to characterize postpetition but preconversion alimony as prepetition alimony entitled to priority under section 507(a)(1). (OSC Hearing Tr. 44.) Either

argument is inconsistent with the Code's treatment of domestic support obligations. As set forth in the Memorandum Opinion:

A Chapter 13 debtor, temporarily freed of his other debt obligations and required to pay alimony on a calculus based on his income and expenses, must pay his postpetition alimony as an ongoing expense. In fact, "failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition" is a basis for conversion or dismissal of the bankruptcy case. 11 U.S.C. § 1307(c)(11) (2013).

Section 1325(b) contemplates that a debtor, while formulating a plan, must remain current on his postpetition domestic support obligations. This section requires a debtor to propose a plan that provides "that all of the debtor's projected disposable income to be received [during the plan period] will be applied to make payments to unsecured creditors under the plan." 11 U.S.C. § 1325(b)(1)(B) (2013). Disposable income is defined as "current monthly income received by the debtor ... *less* amounts reasonably necessary to be expended—for the maintenance or support of the debtor or a dependent of the debtor, or for a *domestic support obligation,* that first becomes payable *after the date the petition is filed*[.]" 11 U.S.C. § 1325(b)(2)(A)(i) (2013) (emphasis added). Thus, the debtor deducts postpetition domestic support payments from his monthly income to determine how much disposable income he will have to distribute to his unsecured creditors. This expense is generally expressed on his Schedule J. Accordingly, the debtor should be paying his postpetition domestic support obligations as a separate monthly expense.

In fact, the Code does not even permit the filing of a proof of claim for postpetition domestic support obligations. *Burnett v. Burnett (In re Burnett),* 646 F.3d 575, 582 (8th Cir.2011) (citing 11 U.S.C. § 502(b)(5)). Section 502(b)(5) disallows any claim "to the extent that ... such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title[.]" 11 U.S.C. § 502(b)(5) (2013). Because postpetition domestic support obligations are not part of the debt owed as of the date of the petition, such debts qualify as unmatured. See, e.g., *Burnett,* 646 F.3d at 582 (citing *Foster v. Bradbury (In re Foster),* 319 F.3d 495, 497 (9th Cir.2003)). Thus, a creditor cannot file a proof of claim for postpetition domestic support obligations. "[T]o the extent [the debtor] ha[s] a continuing [postpetition] obligation to pay spousal support, [a] confirmed plan [cannot], and [does] not, affect that obligation." *Burnett,* 646 F.3d at 582 (citation omitted). Therefore, "a Chapter 13 debtor is required to maintain postpetition domestic support obligations on a current basis out of postpetition earnings or income, and such obligations should be reflected in the debtor's schedule of expenses." 8 Collier on Bankruptcy, § 1300.71[3][e] (15th ed. 2005).

While a creditor cannot file a proof of claim for a postpetition domestic support obligation, the same does not hold true for a prepetition domestic support obligation. Commensurate with paying his ongoing postpetition domestic support obligations as an expense, the debtor must address any prepetition domestic support arrearages through a plan that affords the ex-spouse priority under section 507(a)(1). First priority status is given to "*[a]llowed* unsecured claims for domestic support obligations" that are

owed or recoverable to a spouse or ex-spouse *"as of the date of the filing of the petition."* 11 U.S.C. § 507(a)(1)(A) (2013) (emphasis added). Before a debtor can confirm a Chapter 13 plan, the plan must provide for the full payment, in deferred cash payments, of all prepetition domestic support obligations unless the holder of the claim agrees to a different treatment. 11 U.S.C. § 1322(a)(2) (2013); *Hall v. U.S.* [—— U.S. ——], 132 S.Ct. 1882, 1889 [182 L.Ed.2d 840] (2012) (stating "[s]ection 1322(a)(2) ... requires full payment of 'all claims entitled to priority under section 507' under the plan"). These sections make it clear that solely prepetition domestic support obligations should be paid through a debtor's Chapter 13 plan.

Although a debtor can pay a prepetition domestic support obligation through his plan, he must remain current on all postpetition domestic support obligations. As a condition to plan confirmation, the debtor must demonstrate that he "has paid all amounts that are required to be paid under a domestic support obligation, and that first become payable *after the date of the filing of the petition* if the debtor is required by a judicial or administrative order ... to pay such domestic support obligation[.]" 11 U.S.C. § 1325(a)(8) (2013) (emphasis added). Given that plan confirmation is conditioned on paying all postpetition domestic support obligations and failure to pay such obligations can result in dismissal or conversion, "[i]t is evident that Congress requires a chapter 13 debtor to remain current on any domestic support obligation that first becomes payable postpetition." *In re Wise*, 476 B.R. 653, 662–63 (Bankr.D.C.2012). Moreover, a debtor who has diligently completed all his payments under a properly confirmed plan must, as a con-dition to obtaining his discharge, certify that all postpetition domestic support obligation payments have been made. 11 U.S.C. § 1328(a) (2013).

(Memorandum Opinion 20–23, June 10, 2013, ECF No. 74.)

### ii. October 6 Letter and the Divorce Decree

Stephens's October 6 Letter outlined a clear and distinct basis for $9300 in mostly postpetition alimony arrearages. The debtor's Modified Plan, filed on October 8, 2008, mirrors Stephens's calculations exactly. However, at the OSC Hearing, Cruz refused to concede the readily apparent congruity between the two documents. As a result, Cruz's testimony at the OSC Hearing was confusing and, ultimately, misleading on this point. Accordingly, a more detailed digression into the Divorce Decree and the October 6 Letter is required.

The Divorce Decree is dated November 1, 2007, and specifically ordered the debtor to pay three sums. First, the court ordered the debtor to pay Stephens $1100 per month in alimony beginning September 2007, subject to review based on a "substantial change of circumstances" or after one year if requested by either party. Second, the debtor was to pay Stephens's attorney's fees and costs of $10,890 at $300 per month beginning October 2007. Third, the debtor was to pay Stephens restitution for lost wedding rings in the amount of $2350 at $100 per month beginning October 2007. A child support award discussed in the Divorce Decree was not a factor in the October 6 Letter.

According to Stephens's October 6 Letter, the debtor owed $14,300 in accrued alimony, which represented thirteen missed payments from October 2007

through October 2008.[7] Under the category "Total Property Award," Stephens line-itemed $1300. This amount obviously represented thirteen missed restitution payments of $100 each. Under the category "Attorney's fees 1st case," Stephens line-itemed $3900, obviously thirteen missed payments of $300 each on the attorney's fee award. Stephens also line-itemed an additional award of $500 in attorney's fees ordered on January 3, 2008, related to her prepetition pursuit of the debtor for contempt in early January 2008. Stephens then applied the $5000 bond paid by the debtor's parents to the total. Stephens testified at the AP Trial that she applied the $5000 to accrued alimony. (AP Trial Tr. 129, Mar. 20, 2013.) Cruz testified at the OSC Hearing that she likewise applied the $5000 bond to the past due alimony when she reviewed the October 6 Letter and prepared the Modified Plan. (OSC Hearing Tr. 23, July 24, 2013.) Deducting the $5000 bond from $14,300 in alimony arrearages results in an alimony balance of $9300.[8]

### iii. Modified Plan

The Modified Plan provided "[t]hat the *priority* debt to [Stephens] in the amount of $9,300.00 for past due *alimony* shall be paid in full during the life of the plan with a pro-rata monthly payment and 0% inter-est." (Cruz Ex. 1 at ¶ 5.) (emphasis added). The Modified Plan also provided for the full payment of the restitution and attorney's fee awards of $2350 and $10,890, respectively. (Cruz Ex. 1 at ¶ 3, 4.) The Modified Plan then explicitly provided that the debtor "shall continue to pay his current monthly alimony of $1,100.00 to [Stephens] direct." (Cruz Ex. 1 at ¶ 7.)

The October 6 Letter and the Modified Plan mirror each other and are easily reconcilable. However, once the OSC required Cruz to account for why she inappropriately characterized and included postpetition alimony as prepetition alimony, confusion resulted. At the OSC Hearing, Cruz introduced the novel theory that she was entitled to characterize postpetition but preconversion alimony as prepetition alimony entitled to priority under section 507(a)(1). (OSC Hearing Tr. 44.) Cruz's new theory requires, however, the accrual of the entire $9300 on or before July 1, 2008, the date of conversion. Unfortunately for Cruz, part of the $9300 in alimony clearly accrued after July 1, 2008. Therefore, her theory has a factual hiccup. Thus, for purposes of the OSC Hearing, Cruz manufactured an inarticulate, inconsistent, and inaccurate explanation of how

---

**7.** Stephens never explained why her calculations began with October 2007 instead of September 2007. Regardless, all or all but $500 of the $9300 accrued postpetition.

**8.** The debtor filed his Chapter 7 petition on January 24, 2008. By January 2008, the debtor owed $5500 in alimony (September 2007 inclusive of January 2008, or five months at $1100 a month), but after applying the $5000 bond to that amount, he only owed $500 in prepetition alimony. While all of the parties at the AP Trial agreed that the debtor had not made his alimony payments, at various times different individuals used different starting dates. The Divorce Decree recited September 2007 as the starting date; Stephens in her October 6 Letter used a thirteen month period beginning October 2007; Crawford, Stephens's attorney, referenced a twelve month period at the December 2008 Circuit Court hearing. This uncertainty does not affect the fact that either none or all but a small portion of the alimony in question accrued postpetition. That small prepetition amount, no larger than $500 under any scenario, could properly be listed as a priority claim under 11 U.S.C. § 507(a)(1). Any alimony that became due after January 24, 2008, accrued postpetition. Thereafter, alimony each month should have been paid as an ongoing expense. The Modified Plan, in fact, references the $1100 as a separate ongoing payment, but the debtor never paid it as such.

she arrived at the $9300 figure contained in the debtor's Modified Plan.

During her counsel's initial direct examination, Cruz suggested that Stephens's figures were simply "wrong" and "inaccurate." (OSC Hearing Tr. 17, 19.) Cruz never satisfactorily quantified that conclusion. She acknowledged receipt and consideration of the October 6 Letter when she generated the October 8 Modified Plan. (OSC Hearing Tr. 16.) She also admitted that she knew when she did her calculations that the $5000 bond had been applied to past due alimony. (OSC Hearing Tr. 23.) [9]

Cruz then made vague references to the $2350 restitution award, which made little sense given that the Modified Plan separately accounted for that figure. (OSC Hearing Tr. 17.) She next referenced a meeting with the debtor where she reviewed a number of documents, including the Divorce Decree and its predicates, viz., Judge Hearnsberger's letters to counsel dated September 20, 2007, and October 22, 2007. (Cruz Ex. 3.) Cruz introduced a compendium of documents as an exhibit, which she asserted she used to determine the $9300 figure. She then explained that the debtor was behind eleven months in alimony which "would have been 7,100 dollars" based on the conversion date of July 1, 2008. (OSC Hearing Tr. 22.) Presumably, eleven times $1100 equals $12,100, which minus the $5000 bond leaves $7100. The record is initially unclear whether Cruz included September 2007, which would be to her client's detriment, or if she used the October 2007 to July 2008 dates, which is only ten months. Cruz eventually stated that she began in September 2007

and calculated that after applying the $5000 bond there would be $500 left outstanding (five months, September 2007 through January 2008, times $1100 minus $5000 equals $500). Cruz added the $500 balance to the February through July 2008 alimony (six months times $1100 plus $500) to arrive at her figure of $7100. (OSC Hearing Tr. 17.)

According to Cruz, the $7100 represented preconversion alimony. However, the amount in the amended Schedule E and the Modified Plan is $9300. Thus Cruz had to account for the difference. Subtracting $7100 from $9300 equals $2200, almost self-evident as the inclusion of the August and September 2008 payments of $1100 each, both of which clearly accrued postconversion. Further, had Cruz started her calculations in October 2007 (October to October) as Stephens's October 6 Letter suggests, there would actually be three postconversion payments.

### iv. Precoversion Theory

At this juncture, Cruz's testimony became inventive and invented. Starting with the $7100 base, Cruz sought to characterize the $2200 balance as a medley of preconversion domestic support obligations rather than alimony. This recharacterization affords her sufficient ambiguity and latitude to suggest that the entire $9300 accrued preconversion. In doing so, Cruz made misrepresentations to this court during her testimony at the OSC Hearing.

At the OSC Hearing, Cruz testified that her assistant incorrectly typed the $9300 in as "alimony" and "I just missed it when I looked at it." (OSC Hearing Tr. 23–24.) Cruz now characterizes the $9300 figure as all prepetition (preconversion) domestic

---

**9.** Also, the Complaint that initiated the adversary proceeding, signed by Cruz, acknowledged that the $5000 bond was applied against the debtor's prepetition alimony payments, stating that the debtor "fell behind in his alimony payments, and was held in contempt of Court and incarcerated until a relative posted a $5,000 bond, which was paid to [Stephens] in January 2008." (Court Ex. 7 at 4.)

support obligations, as her lawyer worded it, "in one form or another[.]" (OSC Hearing Tr. 24.) Cruz then manufactured new and vague components to the $9300 figure. First, she testified that she referred to the orders and the other $500 attorney's fee that was assessed. She then included some unspecified part of the restitution award and some child support, stating "[s]o on basically July 1st, the cut off date, all of [the debtor's] child support was due." (OSC Hearing Tr. 25.)

This testimony is not reconcilable with the actual facts. The debtor's amended Schedule E, prepared by Cruz and filed the same day as the Modified Plan, line-itemed $9300 as "alimony." (Debtor Ex. 13.) In the Modified Plan, also prepared by Cruz, the $9300 is also clearly referred to as "alimony." Child support was not a component of the very specific calculations outlined in Stephens's October 6 Letter. Further, child support had never been listed as past due on any of the schedules, was not listed as past due when the debtor filed, and did not play a dispositive role in the subsequent Circuit Court contempt proceedings or the AP Trial. Cruz contradicted her own testimony on this point when she testified that, when making her calculations, she considered any outstanding child support as "waived at that time." (OSC Hearing Tr. 23.) Also, during examination by the court:

> COURT: And do you recall that the testimony seemed to be consistent that child support played no role in this; do you recall that, that she, Ms. Stephens, testified that's not why I went after him, that's not why I jailed him?
>
> CRUZ: Yes, because it was paid.

(OSC Hearing Tr. 41.)

Additionally, the $2350 restitution amount, or any part of it, could not have been included in the $9300 calculation as the restitution amount is a separate line-item to be paid in full through the Modified Plan. Yet, in her convoluted testimony in response to this court's direct questions concerning how she calculated the $9300, Cruz again tried to include the $2350 in restitution, stating:

> That figure came from the orders, because he also owed another 500 dollars in—in attorney's fees, along with the ten thousand, I think it's 890 dollars. He owed 2,350 in property.

(OSC Hearing Tr. 42.) As for the $500 in attorney's fees from Stephens's prepetition contempt effort, Cruz had no explanation when asked by the court why she did not add that $500 to the outstanding prepetition attorney's fees already awarded. (OSC Hearing Tr. 42.)

Simply stated, Cruz could not reconstruct or explain how she arrived at the $9300 amount provided for in the Modified Plan. This court asked her to be specific. (OSC Hearing Tr. 43.) The following colloquy resulted:

> COURT: You've read the opinion, you see where the figures come from based upon two days and evidence. I want to know if those figures are wrong.
>
> CRUZ: Pre—prepetition, there is 7,100 dollars, and the cut off is July 1, because that's the date of conversion.
>
> COURT: All right. Would you agree with me that July 1 of 2008 is after the petition was filed? The petition was filed in January of '08.
>
> CRUZ: But when you convert, you can go—I believe you can go—you know, it's prepetition to the 13.
>
> COURT: Oh, Ms. Cruz, I've researched that. Are you telling me that—all right, first off, you're telling me two things. Are you agreeing then that the 9,300 dollar figure contained post-

petition accrued alimony, and by that I mean post-January 2008 alimony?

CRUZ: I believe it did, because I figured from July 1.

COURT: No, Ms. Cruz, listen to my question. And I'm really trying to be as direct as I can. You're saying there was 7,100 dollars that was prepetition alimony; is that right?

CRUZ: Well, pre-conversion alimony. Maybe that—maybe—

COURT: All right. That's different than prepetition, isn't it?

CRUZ: Yes. Maybe that makes it clearer, pre—

COURT: All right. So would you agree with me that from the date they filed their bankruptcy, which was January of 2008, that alimony accrued up until October of 2008 when you amended the schedules?

CRUZ: No, it would be September.

COURT: You're assuming the October one is not due yet?

CRUZ: Well, the order is from September to September. So there's only one month, August, everything else would be pre—pre-conversion.

COURT: All right. You're still trying to use conversion. Can you give me a statute that says that there is some basis for saying that you can ignore postpetition accrued alimony and call it prepetition accrued alimony because of the date of the conversion?

CRUZ: No, I can't, not as I sit here.

COURT: All right. And when you sat down and made these decisions in October of 2008, did you know of such a statute?

CRUZ: I'm not sure.

COURT: All right. So would you agree with me that a lot of that 9,300 dollars accrued after the debtor, Mr. Young,

filed his bankruptcy in January of 2008?

CRUZ: Yes.

COURT All right. But your amended schedules and your amended plan called it post—excuse me—prepetition accrued alimony. And what I don't understand, just so you know where I'm headed, even if you use that conversion date, that's not right, because your amendment was in October of 2008 and the conversion was in July of 2008.

CRUZ: Yes.

COURT: So under any theory, some of those figures include postpetition alimony; am I right?

CRUZ: That would happen if—if you're considering when it was first filed, yes.

COURT: And so, you're aware that prepetition. alimony and postpetition alimony are treated differently by the Code?

CRUZ: Yes.

COURT: Why did you characterize postpetition alimony, be it January or July, as prepetition alimony?

CRUZ: What I did was used the July 1 cut off date and I—I—

COURT: Ms. Cruz?

CRUZ: —it may be wrong, but I—I can only tell you what I did.

COURT: But, Ms. Cruz, here is my question. If you used the July 1 date—let me say—let me give that to you, you'll agree with me that part of that 9,300 includes alimony that accrued in July, August, September; that's 3,300 dollars, correct?

CRUZ: It is.

COURT: Under your theory?

CRUZ: It is.

COURT: That 3,300 dollars is in that 7,100 or 9,300 dollar figure, correct? It's got to be somewhere. In October, you amended, for the first time ever, Schedule E and said there was 9,300 dollars in prepetition alimony. Because that's the only thing that goes on a Schedule E.

CRUZ: Then that would not be right.

COURT: All right. Why did you put postpetition alimony and treat it as prepetition alimony, whether it's 3,300 dollars, 7,100 dollars, or 9,300 dollars?

CRUZ: Well, I didn't mean to, if I did. What I was doing was taking the July 1st date of the conversion, and I figured the alimony back from there, and then the other things that were owed in the orders.

COURT: All right. If there was other things, are you saying that it didn't include the 3,300 from July to October, which arguably is 4,400 depending on when it's due in October?

CRUZ: No, it didn't—it didn't include August forward. I used the July cut off date.

COURT: Then you need to tell me specifically, specifically what comprised that 7,100 dollars. You've made an allusion to a 500 dollars attorney's fees.

CRUZ: Yes.

COURT: Wouldn't that be added to the attorney's fees of 10,890 dollars?

CRUZ: No, it's a separate attorney's fee because there was a separate hearing.

COURT: Then why did you categorize it as alimony?

CRUZ: I told you we made a mistake. It's DSO.

COURT: Do you have written out, whether constructed then or now, any-thing that tells me how you arrived at the 9,300 dollar figure?

CRUZ: I don't have it written out. I gave the figures to my attorney.

COURT: Can you tell me? Can you, other than just saying you used the orders, I will hand you the orders, can you tell me how you came up with 9,300 dollars, other than as I put them in the order?

CRUZ: There is 10,890 dollars in one attorney's fee. There is a second attorney's fee of 500 dollars. There is restitution of—I think it's 2,350. There is alimony to the July 1 date, from September on, after you deduct the bond, of 7,100 dollars.

COURT: All right. So that's 7,600 plus 2,300?

CRUZ: Yes.

COURT: 2,350. That's 9,950 dollars.

CRUZ: Yes. And then there's child support for July, because it would be due on the 1st, of 787.50.

ROSENZWEIG: Your Honor, may I approach? There is—

COURT: Certainly.

ROSENZWEIG: Give her some documents.

COURT: All right. So 787.50. That comes out to $10,737.50.

COURT: Do you have something that will help us in this?

MR. ROSENZWEIG: This is where you were talking about it.

CRUZ: Uh-huh.

ROSENZWEIG: Okay.

(OSC Hearing Tr. 43–48.)

Cruz never could explain her calculation of the $9300 figure. She attempted to include all or parts of attorney's fees and restitution that were fully accounted for in other areas of the Modified Plan. At one point during the OSC Hearing, this court

specifically stated to Cruz's attorney: "I mean, that's the number she used continuously. And it actually fits very well with the October 6 letter that was written by Mrs. Stephens; in fact, it fits exactly. And I'm trying to discern if that was wrong." (OSC Hearing Tr. 50.) Yet, Cruz never offered a valid explanation on this crucial point.

After the lunch break during the OSC Hearing, Cruz offered another inadequate mathematical explanation. This explanation included the $7100 alimony figure, attorney's fees of $500, plus child support of $787.50, leading to the following legerdemain:

> ROSENZWEIG: Okay. And that—now that gets us to 8,462.50. And was it correct that there were some other additional odd amounts that were owed in child support and that type of thing?
>
> CRUZ: Yes.
>
> ROSENZWEIG: You know, at 50 or 75 dollars or something, right?
>
> CRUZ: Yes.
>
> ROSENZWEIG: And looking back, do you think that's how you got to the 9,300?
>
> CRUZ: Yes.

(OSC Hearing Tr. 62.)

Apparently, Cruz still could not quantify her calculations. No schedule, exhibit, or credible testimony ever reflected any figures that would support Cruz's preconversion theory by demonstrating that the $9300 figure represented anything other than alimony, some of it postconversion.

Additionally, Cruz's entire calculus ignores the fact that the debtor's Schedule J from the first date of filing reflected that he was paying his monthly alimony of $1100 as an ongoing expense. He was not.

Cruz never accurately amended the debtor's Schedule J. This Schedule J expense is never accounted for other than in the $9300 calculation.

At the OSC Hearing, Cruz posited that the entire $9300 dollar amount in fact accrued from January to July 2008, did not include any alimony accruing after July, included amounts which she cannot reconstruct and amounts already included in other specific categories that by "coincidence"—Cruz's exact choice of words—equal $9300, the same number produced by the simpler and more accurate reconciliation of the October 6 Letter and the Modified Plan. (OSC Hearing Tr. 73.)

Cruz's new math was even contradicted by her own client, the debtor, well before the OSC Hearing when he testified at the AP Trial.

> HONEY: [10] But that wasn't—that wasn't really true, was it? The 8,200 dollar order for alimony, number one on Judge Hearnsberger's list, you never put into your plan, did you?
>
> DEBTOR: That's part of the 9,300 dollars—the 1,100 dollars you had me read earlier was post-petition, so the—I believe it's probably number five or six in there, is the 9,300 dollar amount, that's for past alimony. That's—so the 1,100 ongoing after that is post-petition. So if you look back at the figures with the 9,300 dollars, the 8,200 is encompassed in that.
>
> HONEY: Right. But the finding she made here was a finding based upon current alimony. And your plan proposed to pay current alimony outside of the plan; isn't that correct?

---

10. Marc Honey represented Stephens in the AP Trial.

DEBTOR: Yes.

(AP Trial Tr. 82, Apr. 22, 2013.)

Further, during the AP Trial, the debtor testified from a transcript about his statements to Judge Hearnsberger at the March 9, 2008 contempt hearing.

DEBTOR: "That 8,200 dollars that you were ordered to post in the bond—"

"Yes, Your Honor, all."

"—is sitting there waiting for her to pick up?"

"Not all of it, but it's in a 465 dollar a month payment."

(AP Trial Tr. 95, Apr. 22, 2013.)

Cruz confirmed the debtor's testimony in her redirect during the AP Trial, specifically referencing the Modified Plan.

CRUZ: How much was the alimony that Judge Hearnsberger found was owed?

DEBTOR: Let's see. 8,200 dollars.

CRUZ: Okay. Let's go back over to Exhibit 46, page 107.

DEBTOR: Okay.

CRUZ: Number five.

DEBTOR: Okay.

CRUZ: And what does that say as far as alimony?

DEBTOR: "The priority debt to [Stephens] in the amount of 9,300 dollars for past due alimony shall be paid in full during the life of the plan with pro rata monthly payment and zero percent interest."

CRUZ: Okay. So at the time of your first hearing, all of these amounts were included in the plan?

DEBTOR: Yes.

CRUZ: Okay.

COURT: I'm sorry, Ms. Cruz. I'm trying to find alimony in—we have a separate document that is the modification and that's what's confusing me, because you're using the one that's in the order—or the transcript. What

paragraph in Exhibit 48 are you saying addresses the alimony, past due alimony?

CRUZ: It would be paragraph 14.

COURT: I'm sorry.

CRUZ: Within—within—that's the cash bond that he was to—

COURT: Okay. Hold a second. I'm sorry. I'm trying to find your 9,300 dollar figure.

CRUZ: Let me do it this way, Your Honor.

CRUZ: Mr. Young, how much were—how much did Judge Hearnsberger say that you were past due in alimony?

DEBTOR: 8,200 dollars.

COURT: All right. And that is Exhibit 48? Just a second. Now you've switched gears completely.

CRUZ: That's his testimony.

COURT: No, you—I know what you're trying to do is compare the two. I need you to go in order and—and you're saying the words, and I need to go slow. One second. We've got two exhibits. We've got 48, correct?

CRUZ: Correct.

COURT: And 48 is the order of contempt?

CRUZ: Yes.

COURT: All right. And then are you using 46, when there is actually—what is the one that actually is the modification? And I appreciate that 46 is the one that's encompassed in the transcript.

CRUZ: Transcript.

COURT: All right. If you want to use 46, page 107, all right, start again and go carefully through what you're trying to compare, because I'm not seeing your numbers.

CRUZ: Start with Judge Hearnsberger's order, number six.

DEBTOR: Okay.

CRUZ: What was the total owed in attorney's fees?

DEBTOR: The outstanding balance of 10,890 dollars for attorney's fees.

CRUZ: Okay. Then go to page 107, the modified plan that was introduced at the hearing.

DEBTOR: Okay.

CRUZ: Number three, and what does it say that the attorney's fees included in your plan were?

DEBTOR: The amount of 10,890 dollars.

CRUZ: Go to number 16 in the judge's order, Exhibit 48.

DEBTOR: Okay.

CRUZ: What does it say that the balance is for alimony?

DEBTOR: 8,200 dollars.

CRUZ: Now go back to the modified plan that was introduced in the hearing.

DEBTOR: Okay.

CRUZ: Number five.

DEBTOR: Okay.

CRUZ: What does it say that you have included as alimony in your plan?

DEBTOR: 9,300 dollars.

CRUZ: And what did you go to jail for?

DEBTOR: For failure to pay alimony and child support in a timely manner and attorney's fees not being paid.

CRUZ: Were they not covered in your plan?

DEBTOR: Yes, they were.

CRUZ: Okay. As to child support, was it not agreed by you, Ms. Stephens, and Ms. Stephens'[s] attorney, Mr. Crawford, that your child support was current?

DEBTOR: Yes.

(AP Trial Tr. 107–10, Apr. 22, 2013.)

Cruz further asked the debtor:

CRUZ: And at the time of the Circuit Court hearings, were the amounts included, that you went to jail for, in your plan?

DEBTOR: Yes.

(AP Trial Tr. 113, Apr. 22, 2013.)

During direct examination conducted by her attorney, Stephens succinctly accounted for the $9300 figure at the AP Hearing.

HONEY: Okay. And was there any amount of money or any debt that that provision number seven would apply to that was not previously addressed in—within that modification?

STEPHENS: On the alimony that was listed on the bankruptcy, that was for the first 12 months, and which would be 13,800 dollars [sic]. And then, when we took the 5,000 dollar bond and applied it towards the alimony, which left the 8,200 that everybody is speaking of today. But he did not continue to pay the alimony after that. So from September of 2008 to December of 2008, there was no alimony paid.

HONEY: Okay. And just so we can be clear, I'm going to come over to you and show you this modification. I know you don't have it in front of you.

STEPHENS: Okay.

COURT: Ma'am, what were the dates you just stated?

STEPHENS: September 2007 is when the alimony was ordered to start for 12 months. And then it—the bankruptcy included the 8,200 dollars from that. And then September of '08 to December of '08, there were no payments made.

COURT: To December '08? [11]

STEPHENS: Yes.

HONEY: Okay. Now and I'm showing you what's been introduced as Plaintiff's Exhibit No. 12, the modification that we're talking about. I draw your attention to paragraph number five, is that the provision relating to past due alimony?

STEPHENS: Yes.

HONEY: And how much is that for?

STEPHENS: 9,300.

HONEY: Okay.

STEPHENS: Okay.

HONEY: Now, but it's that provision that—that I'm asking you about. What period of time does that provision relate to in the history of this divorce?

STEPHENS: The 9,300 dollars, I'm assuming is the 12 months, plus a month, minus the 5,000 dollars.

HONEY: Okay. For what period of time?

STEPHENS: September of '07 to September of '08.

(AP Trial Tr. 130–31, Apr. 22, 2013.)

Also, the debtor's attorney elicited the following testimony while cross-examining Stephens at the AP Trial.

PATTERSON: [12] All right. Ms. Stephens, I want to make sure I understood your testimony because I'm a little confused about these—these dates on the alimony. Tell me again the 8,200 dollar number, what dates does that cover?

STEPHENS: Okay. The order said that it was from September of '07, is when the alimony was ordered to start, until—and then it was for the 12 month period after that, which would be 13,800 dollars, at 1,100 dollars a month. And then—

COURT: Just a minute. Would be 13,800?

STEPHENS: 13,800 dollars.

COURT: All right.

STEPHENS: At 1,100 dollars a month. And then the bond that I received, I applied towards the alimony arrearage, which made 8,200 dollars.

PATTERSON: Okay. So that—that time period was from September of '07 through September of '08?

STEPHENS: August of '08.

(AP Trial Tr. 142, Apr. 22, 2013.) [13]

The extensive and entire record in the debtor's case contradicts Cruz's belated calculus. The original Schedule E, filed on January 24, 2008, did not reference any past due alimony. Conversely, the prepetition $10,890 attorney's fees and $2350 restitution awards are specifically and properly referenced as prepetition priority debt. (Pet. 22, Jan. 24, 2008, ECF No. 1.) The debtor's Schedule J included as a monthly expense $1100 in alimony, which Cruz had to know the debtor had not been paying postpetition—or, for that matter, after the July 1, 2008 conversion to a Chapter 13— after reviewing the October 6 Letter and proposing the Modified Plan two days later.

The debtor converted to Chapter 13 on July 1, 2008. Cruz proposed a plan on July 17, 2008, that did not provide for Stephens other than a reference that the

11. *See also* AP Trial Tr. 144–45, Apr. 22, 2013.

12. Cruz associated Annabelle Patterson, an attorney, to assist Cruz during the AP Trial.

13. The September through December 2008 alimony was not, according to Stephens, addressed at the Circuit Court contempt hearings in December 2008 or March 2009. (AP Trial Tr. 145, Apr. 22, 2013.)

debtor would pay his regular monthly support directly; the plan failed to mention past due prepetition alimony. (Debtor Ex. 12; Cruz Ex. 1.) Applying Cruz's logic at the OSC Hearing would have dictated inclusion of postpetition accrued alimony from January through July as prepetition debt in the first plan. She did not do so. Even the Petition that generated the contempt proceeding in Circuit Court and resulted in the adversary proceeding for a stay violation recites that the debtor had failed to "pay said alimony and currently is in arrears the total sum of $9,300.00." (Debtor Ex. 45 at 2, ¶ 4.)

In this context, the proof of claim filed by Stephens is illuminating. Stephens filed a proof of claim in the amount of $25,840 on March 10, 2009, one day after the March 9 Circuit Court contempt hearing. Stephens did not itemize the proof of claim; she simply characterized the full amount as a claim for domestic support obligations under 11 U.S.C. § 507(a)(1)(A).

At the OSC Hearing, Cruz testified that she filed an objection to Stephen's claim because "there was included in there some postpetition DSO." (OSC Hearing Tr. 36–37.) But the actual objection makes no such assertion. Rather, the objection merely states that "[t]he proof of claim does not accurately state the amount owed." (Debtor Ex. 28.) An *Order Sustaining Objection to Proof of Claim* was entered on July 29, 2009, and reflected the parties' agreement that Stephens would have thirty days to amend her claim to show an unsecured priority claim in the amount of $21,440. (Debtor Ex. 33.)

Cruz never offered an explanation of how the parties calculated that figure. The math, however, is ascertainable. Adding $2350 in prepetition restitution to $10,890 in prepetition attorney's fees, both prepetition domestic support obligations clearly entitled to priority under section

507(a)(1)(A), equals $13,240. The balance represents alimony: $21,440 minus $13,240 equals $8200 in alimony, an amount consistent with the figure used by Stephens's lawyer in the Circuit Court contempt hearing and Judge Hearnsberger's orders. This figure would include the $500 partial balance still owed prepetition after the $5000 bond was applied in January 2008. The resulting balance of $7700 represents seven missed payments—February, March, April, May, June, July, and August of 2008—all postpetition and, unfortunately for Cruz's new preconversion theory, at least one month postconversion. The actual figure used by Cruz in the amended Schedule E and the Modified Plan is $9300, which includes September, one more month postconversion. As mentioned above, Stephens succinctly testified about the $9300 at the AP Trial.

> HONEY: Now, but it's that provision that—that I'm asking you about. What period of time does that provision relate to in the history of this divorce?
>
> STEPHENS: The 9,300 dollars, I'm assuming is the 12 months, plus a month, minus the 5,000 dollars.
>
> HONEY: Okay. For what period of time?
>
> STEPHENS: September of '07 to September of '08.

(AP Trial Tr. 131, Apr. 22, 2013.)

At the OSC Hearing, Cruz denied that the October 6 Letter was the self-evident source of the full $9300 figure, which represented an accrual of alimony postpetition and postconversion. Cruz now swears under oath that the entire $9300 accrued from January to July 1, 2008, the date of conversion, and is comprised of a medley of unspecified domestic support obligations. Cruz's new preconversion theory could not suffer the inclusion of any postconversion alimony. Thus, Cruz

compounded her Rule 9011 exposure by fabricating a bogus and readily superable explanation for purposes of the OSC Hearing.

Simply put, Cruz had no legal basis, under any analysis, for including postpetition alimony in the Modified Plan. She, accordingly, mischaracterized the $9300 rather than disclose to the Trustee and the debtor's other creditors its real nature when she filed the amended Schedule E listing the $9300 as prepetition alimony and a priority debt under section 507(a)(1). Concurrently, she characterized the $9300 in the Modified Plan as "priority debt" for "past due alimony" coupled with the gratuitous statement that the debtor "shall *continue* to pay his current monthly alimony of $1,100.00 to [Stephens] direct," a clear inference that he had been doing so all along. (Debtor Ex. 12 at 1; Cruz Ex. 1.) (emphasis added)

Alternatively, Cruz's preconversion argument has no basis in the law or a reasonable extension of the law. Section 348(a) of the Code clearly states that conversion of a case from one chapter to another "does not effect a change in the date of the filing of the petition." While an exception to this rule exists, the exception does not apply to Chapter 7 conversions. *See* 11 U.S.C. § 348(d) (2013). *See also In re Bottone*, 226 B.R. 290, 294 (Bankr.D.Mass.1998) (stating that "[s]ection 348(d) does not apply to claims arising *in Chapter 7 cases* subsequently converted to another chapter.").

At the OSC Hearing, Cruz could cite no statutory basis, including section 348, in support of her argument.

COURT: All right. You're still trying to use conversion. Can you give me a statute that says that there is some basis for saying that you can ignore postpetition accrued alimony and call it prepetition accrued alimony because of the date of the conversion?

CRUZ: No, I can't, not as I sit here.

COURT: All right. And when you sat down and made these decisions in October of 2008, did you know of such a statute?

CRUZ: I'm not sure.

(OSC Hearing Tr. 45.)

v. Continued Payment of Alimony

The Modified Plan volunteered that the debtor "shall continue to pay his current monthly alimony of $1,100 to [Stephens] direct." (Debtor Ex. 12 at 1.) The term "continue" invited scrutiny as the debtor had not, prior to the filing of the Modified Plan, made a single postpetition monthly payment.

In her testimony regarding the use of "continue," Cruz stated, "I might have used a better word, but what I was trying to express is that anything that was *after July 1* was ongoing and he would pay that outside the plan." (OSC Hearing Tr. 39) (emphasis added). Yet Cruz crafted and filed the Modified Plan on October 8, 2008, after reviewing the October 6 Letter. Thus, she acted with the full knowledge that the debtor had not been paying his monthly alimony as a Schedule J expense, *including payments after July 1.* She was also aware that the debtor had enjoyed, since filing in January 2008, the full benefit of this phantom deduction from his disposable income calculation. Cruz's use of the term "continue" was disingenuous and misleading, designed to both foster the impression that the debtor had been routinely paying his postpetition alimony and abet the disguised treatment of postpetition alimony as prepetition priority debt.

Cruz simply disregarded the debtor's Schedule J, which showed his alimony as an ongoing $1100 monthly expense. Amazingly, Stephens eventually got paid from the debtor's monthly disposable income payment of $465, an amount already calculated as if the debtor had been mak-

ing his monthly Schedule J alimony payments to Stephens.[14] As discussed in the Memorandum Opinion, the Trustee made distributions to Stephens as Cruz had filed an amended Schedule E that characterized the $9300 as a prepetition priority debt under section 507(a)(1). Thus, with a few deft mischaracterizations, Cruz prioritized postpetition alimony and left undisturbed an illusory $1100 a month expense deduction throughout the debtor's case—postpetition, preconversion, and postconversion.[15]

## C. Conclusion

The Modified Plan violated Rule 9011 as Cruz formulated and filed it for an improper purpose. At both its inception and as Cruz later recharacterized it at the OSC Hearing, it was based on legal contentions not warranted by existing law or the non-frivolous extension, modification, or reversal of existing law, or the establishment of new law. Further, the factual statements in the Modified Plan lacked evidentiary support; the alimony was not priority prepetition debt and the term "continue" purposefully inferred that the debtor had been making his postpetition alimony payments, something Cruz knew to be untrue. Additionally, Cruz made misrepresentations to this court in support of her preconversion theory at the OSC Hearing.

### 2. The Modified Schedule E: $9300 in Alimony Characterized as an Unsecured Priority Claim

A. The OSC asked Cruz to address the following:

Also on October 8, 2008, Cruz, on behalf of the debtor, amended his Sched-

ule E to add $9300 in alimony, as an unsecured priority claim under section 507(a)(1), to the previously scheduled $10,890 in attorney's fees and $2350 in restitution. Section 507(a)(1) is intended to address prepetition past due domestic support obligations. Most of the alimony accrued postpetition. (Debtor's Ex. 13 at 3.) On the same date, Cruz, on the debtor's behalf, amended his Schedule J. (Debtor's Ex. 15.) The amendment continued to reflect the debtor's monthly alimony expense of $1100 even though he had not been making his alimony payments, directly or indirectly, to his ex-wife. The debtor did not do so thereafter.

### B. Analysis

The merits of this issue have been addressed above. At the OSC Hearing, Cruz acknowledged knowing that section 507(a)(1) applied to prepetition debt. (OSC Hearing Tr. 51.) She also made an ambiguous and unquantified assertion at the OSC Hearing that instead of alimony the figure should have been referenced as a domestic support obligation. (OSC Hearing Tr. 31.) (See also OSC Hearing Tr. 41, where Cruz stated "That's—yeah, that's mischaracterized. It should be DSO.") Her reasons for the belated distinction have also been addressed above.

At the OSC Hearing, Cruz implied that the *Order Sustaining Objection to Proof of Claim* signed by the Honorable Ben T.

---

**14.** Disposable income is defined as "current monthly income received by the debtor ... *less* amounts reasonably necessary to be expended—for the maintenance or support of the debtor or a dependent of the debtor, or for a *domestic support obligation,* that first becomes payable *after the date the petition is filed*[.]" 11 U.S.C. § 1325(b)(2)(A)(i) (2013) (emphasis added).

**15.** At the AP Trial, Stephens testified that she assumed her alimony ceased when she remarried in March 2009. The debtor thought so also. He did not, however, ever amend his Schedule J or any of his plans to account to his other creditors for the nonexistent continuing deduction.

Berry on July 29, 2009, might afford her some protection in this context. That order resulted from the debtor's objection to Stephens's proof of claim and ordered Stephens to amend her claim to show an unsecured priority claim of $21,440. Missing from Cruz's argument is that the debtor, of course, did not object to Stephens's proof of claim based on the fact that postpetition alimony was impermissibly accorded priority status. That result is exactly what the debtor wanted to happen. Cruz merely objected to the proof of claim based on the amount while actively fostering an incorrect characterization through her amended Schedule E and the Modified Plan. As far as the Trustee, the court, or any creditor knew, Stephens's proof of claim addressed solely prepetition domestic support obligations entitled to priority under section 507(a)(1).

### C. Conclusion

█ Schedules are not subject to Rule 9011. Therefore, the court finds no Rule 9011 violation in this instance. However, this issue formed part of the court's inquiry as the amended schedule was integral to the methodology Cruz employed to address the debtor's postpetition alimony payments in a manner contrary to the Code and his own Schedule J.

### 3. The Complaint

A. The OSC asked Cruz to address the following:

The Complaint contains the following allegation: "At the hearing on March 9, 2009, [the debtor's] plan in bankruptcy was still not confirmed, [the debtor's ex-wife] still had not been paid because [she] had failed to file a Proof of Claim, and had continued to object to confirmation." (Compl. 5, Jan. 5, 2011, AP ECF No. 3.) This statement is incorrect insofar as alimony is concerned. The debt-

or's Schedule J and his proposed but unconfirmed plans contemplated him making his monthly alimony payments directly to his ex-wife; the money with the trustee represented his disposable income calculation and was for the prepetition debt owed to his other creditors. His ex-wife may have been entitled to a pro rata distribution with other creditors for her prepetition attorney's fees and restitution judgment but not her alimony. She had no need to file and was not permitted by the Code to file a proof of claim for ongoing postpetition alimony. Further, she did not have an objection pending on March 9, 2009; the only remaining impediment to confirmation was the objection by the trustee, one basis of which was the debtor's failure to provide proof that he was paying his postpetition domestic support obligations.

### B. Analysis

The allegations contained in the Complaint are untrue. Worse, they are the result of studied calculation. Specifically, Cruz sought, in the adversary proceeding, to demonstrate that Stephens willfully violated the stay by trying to collect money that was readily available and to which she was legally entitled had she only filed a proof of claim and ceased filing objections to the debtor's proposed plans. Cruz echoed this theme throughout the AP Trial, arguing in closing that "[Stephens] proceeds to bring a contempt in November. All through this period of time, in the November hearing, there is—[Stephens] files no proof of claim." (AP Trial Tr. 169–70, Apr. 22, 2013.)

#### i. Plan Objection

At the OSC Hearing, Cruz's attorney stated in his opening statement:

There was a reference in I believe the—I'll call it count four of your mo-

tion—to a quote from the amended complaint talking about there had been and that there was an objection. There had been objections which, as it turns out, had been withdrawn very shortly before the amended complaint was drafted and there was an issue, I would suppose, of present tense versus past tense in that. (OSC Hearing Tr. 10.)

Cruz's testimony was nonresponsive on this point at the OSC Hearing. Cruz conceded that she "was a bit inartful there." (OSC Hearing Tr. 36.) But she did not provide any valid legal or factual basis for the allegations she made in the Complaint on this point. In fact, Stephens had no objection to confirmation pending at the March 9, 2009 contempt hearing in Circuit Court. Stephens withdrew her objection at a hearing held January 21, 2009, followed by the entry of an order on February 9, 2009. (Debtor Ex. 21.) Further, the objection was never in proximity to the original Complaint initiating the adversary proceeding filed on December 30, 2010, and amended on January 5, 2011—nearly two years after Stephens withdrew her objection.

### ii. Proof of Claim

Likewise, Cruz offered no testimony to support the Complaint's allegation that Stephens did not receive alimony payments because she failed to file a proof of claim. Commencing with his filing in January 2008, the debtor's Schedule J always reflected an ongoing monthly expense of $1100 for alimony.[16] Stephens had absolutely no obligation to file a proof of claim for postpetition alimony. As set forth above and in the Memorandum Opinion:

In fact, the Code does not even permit the filing of a proof of claim for postpeti-

tion domestic support obligations. *Burnett v. Burnett* (*In re Burnett*), 646 F.3d 575, 582 (8th Cir.2011) (citing 11 U.S.C. § 502(b)(5)). Section 502(b)(5) disallows any claim "to the extent that ... such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title[.]" 11 U.S.C. § 502(b)(5) (2013). Because postpetition domestic support obligations are not part of the debt owed as of the date of the petition, such debts qualify as unmatured. See, e.g., *Burnett*, 646 F.3d at 582 (citing *Foster v. Bradbury* (*In re Foster*), 319 F.3d 495, 497 (9th Cir.2003)). Thus, a creditor cannot file a proof of claim for postpetition domestic support obligations. "[T]o the extent [the debtor] ha[s] a continuing [postpetition] obligation to pay spousal support, [a] confirmed plan [cannot], and [does] not, affect that obligation." *Burnett*, 646 F.3d at 582 (citation omitted). Therefore, "a Chapter 13 debtor is required to maintain postpetition domestic support obligations on a current basis out of postpetition earnings or income, and such obligations should be reflected in the debtor's schedule of expenses." 8 Collier on Bankruptcy, § 1300.71[3][e] (15th ed. 2005).

(Memorandum Opinion 21–22, June 10, 2013, AP ECF No. 74.) (footnotes omitted).

Cruz's assertion that Stephens delayed her distribution by not filing a proof of claim for postpetition alimony is contrary to the Code. The debtor did not make his alimony payments directly to Stephens and fell behind immediately. Cruz knew that the debtor's failure to pay any postpetition domestic support obligation was a basis for

---

**16.** Later amended to $800 a month per Judge Hearnsberger's Contempt Order entered on December 18, 2008. (Debtor's Ex. 48.)

dismissal of his bankruptcy. Cruz told the debtor in a letter dated September 22, 2010, when he fell behind in his child support:

I need to warn you that since you have post-petition child support arrearages, that is grounds for the Bankruptcy Court to immediately dismiss your pending Chapter 13. The moment we file the Adversary Proceeding (AP) against [Stephens], she will probably move to dismiss your Chapter 13 Bankruptcy, leaving you again very vulnerable to whatever a State Court Judge determines the penalty to be for not timely paying Court ordered child support.

(Cruz Ex. 4.)

C. Conclusion

Cruz's allegations in the Complaint violated Rule 9011. Stephens had no objection to confirmation pending at the March 9, 2009 Circuit Court contempt hearing. Further, Stephens had no legal obligation to file a proof of claim to receive postpetition monthly alimony payments clearly expressed on the debtor's Schedule J as a monthly postpetition domestic support obligation expense.

### 4. The Third Modified Plan

A. The OSC asked Cruz to address the following:

Confirmation of the debtor's plan, as modified, took an inordinate amount of time. The debtor's ex-wife withdrew her objection to his plan on January 21, 2009. The trustee had the only other objection, which remained pending for over two years. The debtor and the trustee collectively asked for or consented to repeated continuances of the confirmation hearing. (Debtor's Ex. 1.) The trustee's objection—based on the debtor's failure to provide proof of payment of postpetition domestic support obli-

gations—remained unresolved during this period. Finally, on March 22, 2011, Cruz, on behalf of the debtor, filed a *Modification of Chapter 13 Plan* ("Third Modified Plan") wherein the debtor stated that he "believe[d] he [was] current on all domestic support obligations that were due after the filing date of his chapter 13 plan." (Mod. of Ch. 13 Plan, Mar. 22, 2011, ECF No. 210.) That statement is the only substantive term of the Third Modified Plan; all other provisions of the plan remained the same. Apparently, this act was the last impediment to confirmation, and the court entered its *Order Confirming Chapter 13* on April 6, 2011. (Debtor's Ex. 38.) The statement concerning postpetition domestic support obligations contained in the debtor's Third Modified Plan may have been false when made. The debtor had not paid postpetition alimony to his ex-wife directly or through his plan. The Third Modified Plan may have been filed solely to obtain confirmation of the debtor's plan under 11 U.S.C. § 1325(a)(8).

B. Analysis

This is the most serious allegation. Standing alone, a false certification merely to obtain confirmation would have generated the OSC. This court is firmly convinced that Cruz knew exactly what she was doing in filing the self-fulfilling certification that, in effect, certified that postpetition alimony had been paid so a plan could be confirmed that would then pay the postpetition alimony, thus over time making the certification true. In doing so, Cruz manipulated the Code, the court, and the bankruptcy system.

The Code is clear. A prerequisite to confirmation is that the debtor "has paid all amounts that are required to be paid under a domestic support obligation, and

that first become payable after the date of *the filing of the petition.*" 11 U.S.C. § 1325(a)(8) (2013) (emphasis added). The Trustee repeatedly objected to the debtor's plan, specifically citing section 1325(a)(8) and pointing out that the debtor "had failed to provide proof that [he] ha[d] paid all amounts required *to be paid under a domestic support obligation that first* [became] payable after the *date of the filling of the petition.*" (Obj. to Conf., Aug. 21, 2008, ECF No. 48; Obj. to Conf., Dec. 1, 2008, ECF No. 94; Obj. to Conf., Mar. 16, 2009, ECF No. 116; Obj. to Conf., Mar. 19, 2009, ECF No. 118.) (emphasis added). Cruz crafted the Third Modified Plan carefully, stating that the debtor "*believes* he is current on all domestic support obligations that were due after the *filing date of his chapter 13 plan.*" (Court Ex. 8.) (emphasis added). In doing so, she retained deniability, substituting the term "believes" for unequivocal proof or a proper certification. Additionally, she deftly substituted language that utterly and completely defeated the specific and express purpose of section 1325(a)(8), a manipulation too subtle to have been anything but purposeful.

Cruz's rewrite of section 1325(a)(8) escaped sufficient scrutiny, and this court entered its confirmation order on April 6, 2011. But a remedy exists. When confronted by a confirmed plan containing a provision discharging student loan debt in a manner contrary to the Code, the United States Supreme Court in *United Student Aid Funds, Inc. v. Espinosa* stated:

> United argues that our failure to declare the Bankruptcy Court's order void will encourage unscrupulous debtors to abuse the Chapter 13 process by filing plans proposing to dispense with the undue hardship requirement in the hopes the bankruptcy court will overlook the proposal and the creditor will not object. In the event the objectionable provision is discovered, United claims, the debtor can withdraw the plan and file another without penalty.
>
> We acknowledge the potential for bad-faith litigation tactics. But expanding the availability of relief under Rule 60(b)(4) is not an appropriate prophylaxis. As we stated in *Taylor v. Freeland & Kronz,* 503 U.S. 638 [112 S.Ct. 1644, 118 L.Ed.2d 280] (1992), "[d]ebtors and their attorneys face penalties under various provisions for engaging in improper conduct in bankruptcy proceedings," *id.,* at 644 [112 S.Ct. 1644]; see Fed. Rule Bkrtcy. Proc. 9011. The specter of such penalties should deter bad-faith attempts to discharge student loan debt without the undue hardship finding Congress required.

*United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260, 278, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010).

### C. Conclusion

The Third Modified Plan violated Rule 9011. Cruz employed intentionally misleading language for the improper purpose of obtaining confirmation of the debtor's plan. Further, the factual predicates contained in the Third Modified Plan lacked any evidentiary support; Cruz knew the debtor had not paid his postpetition alimony. Although Cruz obtained confirmation, *Espinosa* clearly states that this court may still address her Rule 9011 obligations.

### V. Award of Sanctions

 Sanctions are warranted in this case, but the sanctions must be limited to what is sufficient to deter repetition of the conduct outlined above as well as comparable conduct by others similarly situated. *Crofford,* 301 B.R. at 885. The sanctions can be monetary or nonmonetary. Nonmonetary sanctions include issuing an admonition or reprimand, re-

quiring participation in continuing legal education, ordering à fine payable to the court, referring the matter to disciplinary authorities, or suspending the attorney from practicing in the bankruptcy court. Suspension must not result in "financial devastation." *Household Credit Servs., Inc. v. Dragoo* (*In re Dragoo*), 219 B.R. 460, 467 (Bankr.N.D.Tex.1998).

The debtor did not pay his postpetition alimony. Cruz knew the consequences. Cruz deftly amended the debtor's schedules and proposed a plan completely at odds with the Code. Then, to obtain confirmation of that plan, she filed a false certification. When this court issued its OSC, Cruz adopted a new argument, suggesting that she simply rolled preconversion alimony into the debtor's plan. Her new argument, however, fails if any postconversion alimony is included. Accordingly, Cruz manufactured an explanation. In doing so, she testified falsely at the OSC Hearing.

Cruz would have been better served by openly admitting the purpose of the Modified Plan, then and now. Honest and full disclosure at the time might have better served both she and the debtor. Frankly, if there were no valid reasons for what Cruz did, there may have been understandable ones. But two things happened here that deny Cruz the benefit of the doubt. First, her pattern of deft mischaracterizations and manipulation of the Code. Second, Cruz's testimony at the OSC Hearing was simply false. She only made her situation worse and generated a wholly unexpected and new basis for sanctions.

■ For her violations of Rule 9011, Cruz is hereby suspended from practicing directly or indirectly in the United States Bankruptcy Courts for the Eastern and Western Districts of Arkansas for a period of six months commencing September 23, 2013, and ending March 23, 2014. She is also reprimanded and fined $1000 payable to Jean Rolfs, Clerk of the United States Bankruptcy Court, on or before September 27, 2013. Prior to March 23, 2014, Cruz must also provide this court with proof that she has attended twelve hours of continuing legal education in the area of Chapter 13 Bankruptcy.

■ For her misrepresentations to this court during the OSC Hearing, Cruz is hereby concurrently suspended from practicing directly or indirectly in the United States Bankruptcy Courts for the Eastern and Western Districts of Arkansas for a period of six months commencing September 23, 2013, and ending March 23, 2014. She is also reprimanded and fined an additional $1000 payable to Jean Rolfs, Clerk of the United States Bankruptcy Court, on or before September 27, 2013.

Cruz shall take all appropriate measures to ensure that her clients are adequately represented during her suspension. The court will refer and provide a copy of this *Order Imposing Sanctions* to the Office of the Committee on Professional Conduct to take such further actions as it deems appropriate.

IT IS SO ORDERED.